**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>ORCHARD FALLS OPERATING COMPANY, LLC,<br><br>Debtor. | Bankruptcy Case No. 25-16047 TBM<br>Chapter 11 |

# MEMORANDUM OPINION DENYING CONFIRMATION OF CHAPTER 11 PLAN AND GRANTING RELIEF FROM THE AUTOMATIC STAY

## I. <u>Introduction</u>.

Orchard Falls Operating Company, LLC (the "Debtor") is a "single asset real estate" entity that owns a commercial office building located at 7800 E. Orchard Road, Greenwood Village, Colorado (the "Property"). The Debtor financed the 2014 acquisition of the Property through Ladder Capital Finance LLC ("Ladder Capital"). Ladder Capital provided the Debtor with a $19,000,000 loan (the "Loan") evidenced by a typical security package including a promissory note, deed of trust, assignment of leases and rents, security agreement, and fixture filing. Later, Ladder Capital transferred its interests in the Loan to Wilmington Trust National Association, as Trustee for the registered holders of Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass Through Certificates, Series 2014-LC16 (the "Lender").

In recent years, the value of the Property plummeted. The Loan matured in May 2024. The Debtor failed to pay the Lender (and was unable to secure refinancing). So, the Lender commenced foreclosure proceedings against the Property. Although the Lender agreed to forbear for a time, the Debtor and the Lender were unable to reach a consensual workout arrangement. On the eve of foreclosure, the Debtor filed a Petition for relief under Chapter 11 of the Bankruptcy Code.[1]

While filing for bankruptcy protection gave the Debtor some breathing room to evaluate its options and formulate a plan of reorganization, it did little to improve the Debtor's financial circumstances, nor did it change the Lender's position with respect to the Property. The current value of the Property is only $7,200,000; but the Lender has asserted a secured claim in the amount of $17,579,203. Meanwhile, the Debtor faces

---

[1] All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

the prospect that it may lose its most significant tenant in the near future.

In its most recent plan of reorganization, the Debtor takes an optimistic view of its future, providing a five-year forecast in which its income rises and its expenses fall. But, still, the Debtor's own projections predict significant losses over the next five years. The Debtor proposes to pay the Lender's claim with monthly payments over 15 years, followed by a large balloon payment of the remaining $8,597,619 balance at the end of the 15 years. The Lender does not share the Debtor's rosy view of the future, nor agree to its proposed timeline for repayment of a loan that matured years ago. The Lender elected to treat its entire debt as secured, objected to the Debtor's most recent plan, and moved for relief from stay to proceed to foreclose on the Property, or, in the alternative, for dismissal of the case. The Debtor opposes relief from stay and dismissal and asserts that its latest plan should be confirmed.

The Court conducted a trial on the disputes on August 3 and 4, 2026. Having considered the evidence, including the stipulated facts, testimony, and exhibits presented at the trial, as well as the legal arguments of both parties, the Court denies confirmation of the Debtor's latest plan and grants relief from stay to allow the Lender to foreclose on the Property.

## II. Jurisdiction and Venue.

The Court has jurisdiction over the plan confirmation and relief from stay issues pursuant to 28 U.S.C. §§ 1334 and 157(b). The contest is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning the administration of the estate), (b)(2)(G) (motions to terminate, annul, or modify the automatic stay), (b)(2)(L) (confirmations of plans), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. No party in interest has contested the Court's jurisdiction to adjudicate the dispute or the propriety of venue in the Court.

## III. Procedural Background.

The Debtor filed a Petition for protection under Chapter 11 of the Bankruptcy Code on September 19, 2025 (the "Petition Date"). (Docket No. 1.) In Part 7 of its Petition, the Debtor described the Debtor's business as "Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))." About a month later, the Debtor filed its Statement of Financial Affairs and Schedules. (Docket No. 46.) In Schedule A/B, the Debtor identified $6,228,440 in assets, including the Property, which it valued at only $6,000,000. (Docket No. 46 at 10-13.) On Schedule D, the Debtor listed the Lender's claim in the amount of $17,596,642, as a secured claim. (Docket No. 46 at 14.) On Schedule E/F, the Debtor identified $60,556 in priority unsecured claims, and $304,342 in non-priority unsecured claims. (Docket No. 46 at 15-19.)

A few days after the Petition Date, on September 26, 2025, the Debtor filed a

"Motion for Authority to Use Cash Collateral on Interim and Final Basis." (Docket No. 14, the "Cash Collateral Motion.") The Lender filed a "Limited Objection" to the Cash Collateral Motion. (Docket No. 25, the "Cash Collateral Objection.") Ultimately, the parties jointly requested that the Court enter an interim order approving use of cash collateral under certain terms, including the Debtor's making adequate protection payments to Lender in the amount of $45,000 per month, beginning on October 15, 2025. (Docket No. 30.) On October 8, 2025, the Court entered an "Interim Order Authorizing Use of Cash Collateral" in which it required adequate protection payments as requested. (Docket No. 31.) Later, the parties filed a "Joint Motion for Entry of Final Order Authorizing Use of Cash Collateral" seeking entry of an order continuing the $45,000 per month cash collateral adequate protection payments, providing the Lender with a post-petition lien on all post-petition inventory and income derived from the operation of the business and assets, and authorizing use of cash collateral for specific purposes only. (Docket No. 69.) On December 4, 2025, the Court entered a "Final Order Authorizing Use of Cash Collateral" consistent with the parties' request. (Docket No. 71, the "Final Cash Collateral Order.")

On December 18, 2025 (the last possible day the Debtor could have filed a reorganization plan without triggering the Lender's right to immediate relief from the automatic stay pursuant to Section 362(d)(3)), the Debtor filed: (1) "Debtor's Plan of Reorganization" (Docket No. 79, the "Original Plan"); and (2) "Debtor's Disclosure Statement" (Docket No. 80, the "Original Disclosure Statement"). The Court set a hearing on adequacy of the Original Disclosure Statement. (Docket No. 81.)

Prior to the hearing on the Original Disclosure Statement, the United States Trustee ("UST") filed an "Objection" in which it contested the adequacy of the Original Disclosure Statement. (Docket No. 90.) The Lender also filed an "Objection" to the Original Disclosure Statement in which it asserted that the Original Disclosure Statement "lack[ed] critical information a reasonable creditor needs to cast an informed vote" on the Original Plan and further contended that the Original Plan was "patently unconfirmable", in part "because Debtor's source of new funding is speculative, illusory, and insufficient" such that the Original Plan was not feasible. (Docket No. 91.)

Shortly thereafter, the Lender submitted a "Notice of Election Pursuant to 11 U.S.C. § 1111(b)" (Docket No. 92, the "Section 1111(b) Election") and a "Motion for Relief from the Automatic Stay or, in the Alternative, for Dismissal of the Debtor's Bankruptcy Case." (Docket No. 93, the "MFRS"). In the MFRS, the Lender requested authorization to complete the foreclosure against the Property.

At the hearing on the Original Disclosure Statement, the Debtor acknowledged that it both needed to make various amendments to the Disclosure Statement to address the Objections lodged by the UST and the Lender, and that it needed to make substantial amendments to the Original Plan to address the Section 1111(b) Election. Later, the Debtor filed: (1) an Amended Plan (Docket No. 102, the "First Amended Plan"); and (2) an "Amended Disclosure Statement" (Docket No. 103, the "First Amended Disclosure Statement"). The Debtor also submitted an "Objection" to the

MFRS. (Docket No. 106, the "MFRS Objection.") Thereafter, the Lender filed an "Amend[ed] Reply" in support of the MFRS. (Docket No. 112, the "MFRS Reply.")

The Court conducted a preliminary hearing on the MFRS, MFRS Objection, and MFRS Reply on March 6, 2026. At the preliminary hearing, the Debtor and the Lender presented their views about how the Court should proceed to decide the relief from stay issues. The Lender waived certain timing rights under Section 362(e)(2) and 1112(b)(3). (Docket No. 114.) The Debtor indicated that it wished to amend the First Amended Disclosure Statement. (Docket No. 114.) The parties agreed that it would be more efficient for the Court to hear the MFRS, MFRS Objection, and MFRS Reply at the same time that it held a hearing on confirmation of the Debtor's First Amended Plan. Accordingly, the Court denied approval of the First Amended Disclosure Statement and set a deadline for the filing of a new amended disclosure statement. The Court also held the MFRS, MFRS Objection, and MFRS Reply in abeyance pending a combined hearing on confirmation and relief from stay issues.

On March 13, 2026, the Debtor filed: (1) a "Second Amended Plan of Reorganization" (Docket No. 118, the "Second Amended Plan"); and (2) a "Second Amended Disclosure Statement" (Docket No. 117, the "Second Amended Disclosure Statement"). On April 7, 2026, the Court issued an "Order" approving the adequacy of the Second Amended Disclosure Statement pursuant to Section 1125 and set a non-evidentiary hearing on confirmation of the Second Amended Plan and the MFRS, MFRS Objection, and MFRS Reply. Thereafter, on May 4, 2026, the Lender filed an "Objection" to the Second Amended Plan. (Docket No. 133, the "Second Amended Plan Objection.") Later, the Debtor submitted a "Ballot Voting Report" (Docket No. 134) wherein it reported that Class One (the allowed secured claim of the Lender) had voted to reject the Second Amended Plan. Given the remaining disputes over confirmation of the Second Amended Plan and the MFRS, the Court set an evidentiary hearing for August 3, 2026 (the "Evidentiary Hearing"), along with related deadlines. (Docket No. 140.)

Just prior to the Evidentiary Hearing, on July 27, 2026, the Debtor filed a document titled: "Second Amended Plan of Reorganization." (Docket No. 148, the "Third Amended Plan.") Although the Debtor mistitled the document, the Third Amended Plan is the operative plan of reorganization advanced by the Debtor. The Debtor and the Lender also filed a "Joint Stipulation of Facts." (Docket No. 149, the "Stipulated Facts.") Since the Debtor had submitted the Third Amended Plan just days before the Evidentiary Hearing, the Lender filed a "Supplemental Objection to Confirmation of the Plan" in which it addressed the changes made by the Debtor in the Third Amended Plan and argued that the Third Amended Plan could not be confirmed. (Docket No. 150, the "Supplemental Objection".)

On August 3 and 4, 2026, the Court conducted a combined Evidentiary Hearing, on the Third Amended Plan, Second Amended Plan Objection, Supplemental Objection, MFRS, MFRS Objection, and MFRS Reply. On the first day of the Evidentiary Hearing, counsel for the Debtor and the Lender presented opening statements. The Court heard

testimony from four witnesses: Leanne Bourke; Richard Herold; Kenneth Grant; and Alex Shumway. The Court admitted the Debtor's Exhibit Nos. 1, 3, 4, 5, and 9. (Docket No. 151.) On the second day of the Evidentiary Hearing, counsel for both parties presented closing arguments. (Docket No. 152.) The disputes now are ripe for decision.

## IV. <u>Findings of Fact</u>.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c), based upon the admissible evidence presented at the Evidentiary Hearing (including both testimony and exhibits) along with the Stipulated Facts. To the extent that the Court's identification of the foregoing Procedural Background is factual in nature, the Court also incorporates the foregoing Procedural Background as part of the Court's factual findings.

### A. <u>The Debtor and Mr. Grant</u>.

The Debtor is a single-asset real estate entity. Its primary and only significant asset consists of the Property as well as the rental income derived therefrom. (Stip. Fact No. 2.) The Property is a commercial office building, which generates approximately $259,000 in gross rental income per month. (Stip. Fact No. 3.) The Debtor purchased the Property in 2014. (Stip. Fact No. 4.) The Debtor and the Lender have stipulated that the value of the Property is $7,200,000. (Stip. Fact No. 13.)

The Debtor is a limited liability company. On its Petition, the Debtor indicated that Orchard Falls Holding Company, LLC ("HoldCo") was the "Manager" of the Debtor and Kenneth Grant ("Mr. Grant") is the Manager of HoldCo. (Docket No. 1 at 4.) On its "List of Equity Security Holders," Mr. Grant swore, under oath and on behalf of the Debtor, that HoldCo was the "100% Owner" of the Debtor. (Docket No. 43.) Throughout the confirmation process, including even in the Third Amended Plan, the Debtor continued to refer to HoldCo as its owner, "insider," and "Holder of 100% of the Debtor's ownership interests." Notwithstanding, at the Evidentiary Hearing, Mr. Grant for the first time swore the opposite: that HoldCo does not own the Debtor and HoldCo does not even exist. Instead, Mr. Grant testified that the Debtor is wholly-owned by Toma Invest AS, an entity organized and existing in Norway. The Court cannot square Mr. Grant's contradictory statements and testimony. Neither the Debtor, nor HoldCo, nor Toma Invest AS provided any corroborating documentation (such as corporate records) establishing ownership of the Debtor. The Court concludes that the Debtor and Mr. Grant are extremely confused about the Debtor's ownership. The Court guesses that maybe Toma Invest AG owns the Debtor. But what is clear is that Mr. Grant purports to control the Debtor and makes all final decisions for the Debtor. Mr. Grant is a Norwegian investor who has invested in Denver's commercial real estate industry and seems to be the ultimate beneficial owner of the Debtor (perhaps with his family). Meanwhile, the Debtor manages the Property through Toma West Management Corporation ("Toma West"), a property management company formed and wholly owned by Mr. Grant. (Stip. Fact No. 5.)

The Debtor purchased the Property in 2014. (Stipulated Fact No. 4.) When the Debtor purchased the Property, it entered into a "Loan Agreement" and "Promissory Note," executed on April 11, 2014, by the Debtor in favor of Ladder Capital to finance the purchase. (Stip. Fact No. 7.) The Promissory Note is secured by a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing on the Property (the "Deed of Trust"). (Stip. Fact No. 8.)

The Promissory Note was transferred to the Lender in March 2024, and the Lender is the current holder of the Promissory Note. The Promissory Note matured on May 6, 2024. (Stip. Fact No. 9.)

At the time that the Lender received transfer of the Promissory Note, the Debtor was performing under the terms of the Promissory Note. However, the value of the Property had plummeted, and the Debtor was unable to refinance the amount due under the Promissory Note. Recognizing that it would not be able to pay off the Promissory Note at maturity and facing default, the Debtor notified the Lender of its circumstances, and the parties became engaged in negotiations over the Property and the Debtor's obligations.

Prior to the Petition Date, the Debtor defaulted under the terms of the Promissory Note and Section 2.3 of the Loan Agreement. The Lender declared the obligations in default and initiated foreclosure proceedings against the Property in Arapahoe County, Colorado. (Stip. Fact No. 10.)

Under pressure and in an effort to resolve the default, Mr. Grant provided a personal guarantee of the Debtor's obligations under the Promissory Note. Meanwhile, he continued negotiating with the Lender. Together, they agreed to delay the foreclosure action several times as they continued to engage in extensive communications, including through a third-party workout advisor, with the goal of reaching an agreement. Though several proposals were submitted, the parties could not reach a resolution. In September 2025, the Lender determined there were no viable workout options and decided to move forward with foreclosure.

**B. <u>The Debtor's Bankruptcy Case</u>.**

With foreclosure looming, the Debtor filed its Chapter 11 bankruptcy case on September 19, 2025. (Docket No. 1; Stip. Fact No. 1.) In Part 7 of its Petition, the Debtor described the Debtor's business as "Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))." The Lender filed Proof of Claim No. 4 asserting a secured Claim in the amount of $18,018,039. However, the Lender's Proof of Claim shows a "Total Amount Due" of $17,579,203.68 due to certain credits afforded to the Debtor. (Stip. Fact No. 14.)

Early in the bankruptcy case, the Lender worked with the Debtor and agreed on terms for use of cash collateral while continuing to discuss terms of a plan of

reorganization. During the course of the case, the Debtor made adequate protection payments to the Lender. From October 2025 through August 2026, the Debtor made $540,000 in adequate protection payments to the Lender (12 monthly payments of $45,000). The Debtor remains in compliance with the Final Cash Collateral Order. (Stip. Fact Nos. 11 and 12 , Docket No. 158-1 at 7, and Docket No. 162 at 3 and 7.) However, the adequate protection payments made constitute only a fraction of the full debt-service payment due on the Promissory Note.

## C. <u>The Third Amended Plan</u>.

The Debtor filed several iterations of reorganization plans. The Third Amended Plan is the Debtor's most recent and operative reorganization plan. In the Third Amended Plan, the Debtor proposes to pay the Lender's Class One secured claim as follows:

> The Lender's total Allowed Claim shall be paid in 360 equal monthly installments of $49,897.69, commencing on the 1st day of the month following the Effective Date continuing for 180 months, with a balloon payment of $8,597,619 due the month following the 180th payment. The monthly installment amount is derived by using $7,500,000 as the present value of the Lender's collateral with a discount rate of 7%. The aggregate nominal value of the payments will total $17,804,203.
>
> Notwithstanding any other terms or conditions of this Plan, the Lender shall retain its first-priority, perfected, secured Liens and secured promissory notes to the same extent and in the same, first priority as Lender's pre-petition Liens on the Property pending payment to Lender as described in this Plan. The Lender shall release its Liens on its Collateral upon payment in full of the remaining nominal balance of its total Allowed Claim.

(Docket No. 148 at 7.) The text of the foregoing provision of the Third Amended Plan is contradictory. Although the Third Amended Plan states that the Debtor will make monthly payments of $49,897.69 for 360 months (*i.e.*, 30 years), the Third Amended Plan also states that the Debtor will make only 180 monthly payments (*i.e.*, 15 years) followed by a balloon payment. And the numbers don't add. Assuming only 180 payments of $49,897.69, that tallies to $8,981,584.20. Adding the proposed $8,597,619 balloon payment does not yield $17,804,203.

In any event, the Debtor and Lender have stipulated that: "The present value of the monthly payments is $5,551,415, and the present value of the balloon payment is $3,116,173. These amounts together total $8,667,588, which is more than the Property's current fair market value of $7,200,000." (Stip. Fact No. 17.)

With respect to other provisions in the Third Amended Plan, the Debtor proposes to pay Class Two (Unsecured Claims) “a Pro-Rata distribution once per year . . . equal to the Debtor’s Net Income in an amount not to exceed their Allowed Claims” but only if there is “Net Income” available. (Docket No. 148 at 8.) The Debtor proposes to pay the Class Three secured priority claim of the Arapahoe County Treasurer equal annual payments of $17,395 over 60 months. (Docket No. 148 at 8.) The Debtor separately classified the unsecured claim of Commercial Cleaning Systems — Denver Janitorial Division (“CCS”) as Class Four and proposes to pay that creditor $38,437 over six months as a cure payment as part of the assumption of a contract. (Docket No. 148 at 8-9.) The Debtor provides for similar treatment of Toma West separately classified in Class Five. The Debtor proposes to pay that creditor $41,500 over six months as a cure payment as part of the assumption of a contract. (Docket No. 148 at 9)

Finally, the Debtor proposes the following treatment of its Class Six Equity Interests in the Third Amended Plan:

> Class Six consists of the equity Interests of the Debtor. Specifically, Class Seven consists of the equity interests of Orchard Falls Holding Company, LLC (“HoldCo”), the Holder of 100% of the Debtor’s ownership interests. The Holder of Class Six Interests will receive no distribution under the Plan. It will retain its Interests to the same extent that it held such Interests prior to the filing of the Bankruptcy.
>
> HoldCo will make the New Value Payment to the Debtor from money obtained by Kenneth Grant in order for the Debtor’s equity interests to remain unchanged, the value of which represents the shortfall anticipated over the five-year term of the Plan. . . .

(Docket No. 148 at 9.) The provision is problematic since Mr. Grant testified repeatedly at the Evidentiary Hearing that HoldCo no longer exists.

With respect to its administrative claims, the Debtor projects that it will owe professionals who provided services during the bankruptcy case approximately $75,000, providing for payment of that amount during the first year of the Third Amended Plan. (Docket No. 148 at 10-11, Docket No. 117 at 14.)

To fund the Third Amended Plan, the Debtor proposed use of a “New Value Payment”:

> “New Value Payment” shall mean the amount of $2,400,000, split as follows — one $500,000 up front payment to fund operational expenses, shortfalls, the Working Capital Reserve, and payments under the Plan, as well as the

> remaining shortfall over the term of the Plan in the amount of $1,900,000. It shall be paid to the Debtor by Orchard Falls Holding Company, LLC ("HoldCo"), an entity managed by Kenneth Grant, who is also an insider of the Debtor, as part of the Plan.

(Docket No. 148 at 4.) Later, the Third Amended Plan confirms that:

> HoldCo will contribute "new value" to the Debtor in the amount of $2,400,000 split as follows — one $500,000 up front payment on the Effective Date of the Plan to fund payments to Class, and the remaining shortfall over the term of the Plan in the amount of $1,900,000 (the "New Value Payment"). Mr. Grant has committed to obtaining a letter of credit reflecting his ability to obtain this amount to have HoldCo pay towards the Plan, and will commit to providing the same on or before the date of any Confirmation Hearing in this matter. Alternatively, however, Mr. Grant can access the funds from a separate entity, Toma Invest, AS, which is an entity that has since merged with the ultimate parent of the Debtor, Toma Invest. With either option, Mr. Grant, on behalf of HoldCo, will expressly agree to fund both the $500,000 and any remaining shortfall over the term of the Plan, currently estimated at $1,900,000 to be paid in 2028 contingent upon Confirmation of the Plan. The aforementioned funds are unencumbered and will be earmarked specifically for ensuring the Plan, either through a letter of credit or bank guarantee through an escrow account.

(Docket No. 148 at 11.)

Again, the foregoing provisions are problematic since HoldCo does not exist. Mr. Grant also did not seek or obtain a letter of credit as promised. And, there is no bank guarantee either. At the Evidentiary Hearing, Mr. Grant tried to pivot and indicated that another entity controlled by him, Toma Invest AS, a Norwegian holding entity, would contribute new value. But that is not what the Third Amended Plan provides and Toma Invest AS has not committed itself to do so (at least not in writing).

## D. <u>Debtor's Operations, Income, Expenses, and Projections</u>.

### 1. <u>The Property and Management</u>.

The Property, a commercial office building, is approximately 145,000 square feet, and is located on Orchard Road in Greenwood Village, Colorado. Five units in the Property, comprising a total of 16,802 square feet, are vacant. There is easy access to

the Property, which is managed by Toma West.

Richard Herold, Vice President and General Manager of Toma West, has worked at Toma West since 2010. He is engaged in the construction and management of two different properties at present, and has been involved in management of the Property since its purchase in 2014. Mr. Herold is responsible for lease negotiations and lease-related work. He is the person at Toma West who interacts with the brokerage community and is engaged in efforts to attract new tenants. He also interacts with existing tenants in an effort to keep them satisfied.

Leanne Bourke, Chief Financial Officer of Toma West, has worked at the company since 2022. She has 25 years of experience doing financial projections and valuations and assisting in underwriting and loans. Ms. Bourke is the primary person at Toma West responsible for preparing the Debtor's monthly and annual financials and making sure its bills are paid timely. She prepares budgets; tracks cash flow, including payments from tenants; calculates the Debtor's net operating income; and lets the owners of the Property know what projects the Debtor will need to perform. During the bankruptcy case, Ms. Bourke also has been involved in preparing the Debtor's Monthly Operating Reports. ("MORs" collectively or, individually, "MOR").

Both Ms. Bourke and Mr. Herold report to Mr. Grant and keep him advised about matters related to the Property. But Mr. Grant is the one in charge, and he makes all final calls for Toma West and the Debtor.

**2. <u>June Report of Operations</u>**

The Debtor regularly submitted MORs through the bankruptcy case. (Docket Nos. 66, 67, 82, 86, 101, 115, 125, 129, 143, 144, 147, 155, and 158.) In the last MOR submitted prior to the Evidentiary Hearing, for the month of June 2026 (Ex. 3), the Debtor's attached Income Statement showed total monthly revenue in the amount of $278,952.32 (for June 2026), and total year-to-date revenue in the amount of $1,672,920.32, primarily from rental income and parking revenue. The Debtor listed total operating expenses, including utilities, janitorial services, and other maintenance costs, in the amount of $80,300.17 (for June 2026), and $593,395.04 year to date. The Debtor showed administrative expenses, including administrative salaries, consulting fees, management fees, insurance, and taxes, in the amount of $70,472.30 (for June 2026), and $385,784.57 year to date. Finally, the Debtor listed total non-operating expenses, such as expenses for professional fees, space planning, depreciation, amortization, and the $45,000 per month adequate protection payment to the Lender, in the amount of $115,495.92 (for June 2026), and $675,027.67 year to date. Overall, the Debtor showed $266,268.39 in total expenses (for June 2026), and $1,654,207.28 year to date, resulting in net income of $12,683.93 (for June 2026), and only $18,713.04 year to date (January to June 2026). (Ex. 3 at 18-19.)

### 3. The Debtor's Projections

Ms. Bourke, working with Mr. Herold, prepared the Debtor's projections (Ex. 5) (the "Projections") in connection with the Third Amended Plan. Ms. Bourke provided the initial proposed projections to Mr. Herold based on historical information and her knowledge of what is being done in the industry. Mr. Herold provided further input based on his knowledge of the industry and the market, as well as existing and prospective tenants, and made adjustments to the projections. Then Ms. Bourke and Mr. Herold presented the Projections to Mr. Grant for review and further adjustment.

#### a. The Debtor's Revenue Projections.

The Debtor projects that its total revenue during the first five years of the Third Amended Plan will be as follows: $3,323,159 in 2026; $3,236,849 in 2027; $2,484,187 in 2028; $3,380,367 in 2029; and $3,676,088 in 2030. (Ex. 5 at 1.) In making its revenue projections, the Debtor made various assumptions, including that all of its existing tenants will renew their leases. The Debtor also assumed that it would be able to rent some vacant units to new tenants.

The largest tenant of the Property is National Bank Holdings ("NBH"). According to Mr. Herold, NBH was a tenant when the Debtor purchased the Property. About six years ago, NBH acquired People's Bank and expanded its operations into six states. As it grew, it needed additional space and thus began leasing additional space on the first floor. At present, NBH occupies approximately 47,246 square feet of the Property, including units 100, 110, 220, and 300. NBH's current lease with the Debtor expires in October 2027 (or perhaps sooner). NBH's tenancy, and the revenue derived from it, is critical to the Debtor. If NBH does not renew its lease, the Debtor would be in a real bind, since, as Mr. Herold testified, there are "very few people in the market for that size space."

Both Mr. Herold and Mr. Grant testified that Toma West and NBH have discussed renewal of NBH's lease. Based on those discussions, the Debtor "expects" that NBH will renew its lease after confirmation of the Third Amended Plan. The Debtor provided no other evidence, such as correspondence or testimony from a representative of NBH, that might suggest that renewal of the lease was likely or in prospect, but neither did the Lender offer evidence showing that NBH is unlikely to renew.

Though the evidence is far from compelling, the Court accepts the testimony that NBH is likely to renew its lease given the appropriate incentives and in the event that the Court confirms the Third Amended Plan. As such, the Court determines that revenue for a prospective NBH lease is properly included in the Debtor's projections. The Court is mindful, however, that if NBH does not renew its lease, the Debtor would be unlikely to find another tenant or tenants able to lease the same amount of space quickly.

Other current tenants, Cranial Technologies, Inc. ("Cranial Technologies"), Mining Tax Plan LLC ("Mining Tax"), and Robert J. Bess ("RJ Bess") have leases that expire in the near term. Cranial Technologies' lease expires at the end of October 2026, but the company has asked to extend its lease on a month-to-month basis until the outcome of the Debtor's Chapter 11 case is known. According to Mr. Herold, both Mining Tax and RJ Bess intend to renew their leases. Mr. Herold and Mr. Grant believe that the Debtors' bankruptcy case has made some tenants reluctant to renew their leases, and that renewals are more likely to occur if the Court confirms the Third Amended Plan. Again, the Court accepts that the inclusion of revenues from the rental of units to such tenants in the Debtor's Projections is appropriate.

The Debtor has also built into its Projections expected income from rental of units 150 and 155 (which are currently vacant, and which comprise just under 10,000 square feet of space) to a yet-unsigned prospective tenant: Veridyn Group ("Veridyn"). Specifically, the Debtor assumes in its Projections that Veridyn will begin leasing units 150 and 155 in September 2026. It assumes that, to sign Veridyn, it will need to provide periods of free rent at the beginning of the lease term for each unit, continuing through April 2027 for unit 150, and through April 2028 for unit 155. (Ex. 5 at 13-17.) After expiration of the free-rent periods, the Debtor projects that it will receive income from Veridyn for its rental of unit 150 in the following amounts: $14,167 per month from May 2027 through April 2028; $14,450 per month from May 2028 through April 2029; $14,733 per month from May 2029 through April 2030; and $15,017 per month from May 2030 through December 2030. (*Id.*) The Debtor projects that it will receive income from Veridyn for its rental of unit 155 in the following amounts: $5,759 per month from May 2028 through April 2029; $5,872 per month from May 2029 through April 2030; and $5,985 per month from May 2030 through December 2030. (*Id.*) Such amounts tally to at least $825,628 through 2030. Mr. Herold believes that inclusion of income from Veridyn is appropriate because Veridyn has "an extreme interest in renting this particular space." The Court, however, does not share Mr. Herold's view.

As of the date of the Evidentiary Hearing, all that had happened with respect to Veridyn was that Cushman & Wakefield, a real estate broker for the Property, had put together and sent a proposal (dated June 16, 2026) for lease of the two units (Ex. 9), and had engaged in some discussions with Veridyn. According to Mr. Herold, if Veridyn were to become serious about a lease, Toma West would then put together a request for proposal for Veridyn's consideration. However, at this stage, no request for proposal and no lease have been prepared. And, no terms have been agreed upon. Based on the foregoing, the Court finds that a potential lease of space to Veridyn is highly speculative. The Debtor was unable to show that Veridyn has ever even responded to the Debtor's proposal. In fact, there was no evidence at all from Veridyn (either witnesses or documents) showing that Veridyn has any interest in renting any of the Property.

Since the Debtor has not shown that it is probable, or even likely, that Veridyn will rent units 150 and 155, the Court finds that the Debtor's gross revenue Projections are significantly inflated by at least $825,628.

**b. <u>The Debtor's Operating Expense Projections</u>.**

The Debtor projects that its operating expenses, including utilities, janitorial and cleaning, maintenance, administrative, and management fees (among other things) will be $2,242,597 in 2026; $2,308.845 in 2027; $2,378,111 in 2028; $2,449,454 in 2029; and $2,522,937 in 2030. The Debtor includes its operating expenses budget substantial funds to maintain its HVAC system and parking garage. The Court was given no reason to doubt the reasonableness of such projections.

**c. <u>The Debtor's Non-Operating Expense Projections</u>.**

The Debtor projects that its non-operating expenses will be $1,662,613 in 2026; $657,547, in 2027; $1,973,095 in 2028; $610,772 in 2029; and $686,085 in 2030. Projected non-operating costs in 2026 and 2028 are significantly higher than in other years. Such non-operating costs include: landlord expenses, debt service to the Lender, the Class Four and Five claims, administrative expense payments to the Debtor's attorneys, building improvements, leasing commissions, tenant improvements, and space planning, among other things. (Ex. 5 at 1.)

Overall, as reflected in its non-operating expenses, the Debtor does not intend to make substantial improvements to the Property during the Third Amended Plan; however, it budgets $302,868 in late 2026 to improve the elevators in the Property (Ex. 5 at 3) and provides an aggregate of $1,373,830 until 2030 for tenant improvements which, as it explained, are needed to incentivize new tenants and retain existing tenants. (Ex. 5 at 2-11.) In making its non-operating expense projections, Ms. Bourke and Mr. Herold assumed that the cost of tenant improvements for existing tenant spaces would be about $10 per square foot, and the cost of tenant improvements for new tenants, and for tenants that were relocating from one unit in the Property to another, would be about $20 per square foot. (Ex. 5 at 12.) Ms. Bourke reported that she had used the same $10- and $20-per-square-foot cost for tenant improvements since 2022, when she joined Toma West. In addition to providing a tenant improvement allowance to new tenants and some existing tenants, the Debtor anticipates providing incentives, such as periods of free rent, to some current and prospective tenants.

But the Denver real estate market is one of the toughest markets in the country for landlords of office buildings. Alex Shumway, asset manager for the Debtor's loan, testified credibly that, in such a market, it takes more in tenant improvements to keep existing tenants and bring in new ones.

Mr. Shumway is a Vice President and Loan Asset Manager at LNR Partners, a third-party special servicer which services the loans in the Wells Fargo Commercial Mortgage Trust 2014-LC16, Commercial Mortgage Pass Through Certificates, Series 2014-LC16 portfolio for the Lender as trustee. LNR Partners handles the more complex matters related to such loans, including the circumstances that arise after a default occurs. Mr. Shumway's role is to resolve distressed loan situations by attaining the best

net present value possible, as is defined and required under the trust itself and the servicing assignment documents. In this capacity, Mr. Shumway has worked with brokers, experts, and appraisers to get on-the-ground intelligence and to develop a knowledge base. He also relies on the internal knowledge gained from LNR Partners' doing this kind of work for over 30 years. Mr. Shumway is familiar with the overall Denver real estate leasing market and has come to have an understanding of what it takes for landlords in the market to retain and gain tenants. Mr. Shumway is also knowledgeable about the Debtor's loan and the Property, the Debtors' default on the loan, and the subsequent negotiations and actions taken by the Lender to address the loan. The Court found Mr. Shumway credible.

According to Mr. Shumway, prospective tenants for Denver-area office space are gravitating toward buildings with well-capitalized owners — that is, owners that have the ability to deal with capital expenditures when needed, and those that have the capital to provide tenant leasing packages which incentivize tenants to choose their buildings over others competing for tenants. Such incentives might include tenant improvement allowances for building out space, leasing commissions, and free rent. According to Mr. Shumway, a good rule of thumb is that a landlord should offer one month of free rent for each year of a lease term.

Mr. Shumway reports that Toma West is not viewed positively by tenants or tenant-representative leasing brokers in the Denver market. In his view, the revenue projections for the Third Amended Plan are insufficient to rehabilitate that image. According to Mr. Shumway, the Debtor's projections demonstrate that it will not have sufficient capital available to address capital expenditures and to provide the incentives required to retain existing tenants and attract new ones.

In contrast to the Debtor, which used a $10 to $20-per-square-foot tenant allowance in its projections, Newmark, the appraiser engaged by LNR Partners to appraise the Property, assumed, based on its expertise, that the Debtor would need to provide a $60- to $80-per-square-foot allowance for new tenant improvements. Indeed, Newmark recommended that the Debtor offer new tenants a minimum $60-per-square-foot allowance for tenant improvements. Mr. Grant himself acknowledged that one tenant was recently provided with a $90 per-square-foot tenant improvement allowance. Further, another tenant that moved from one floor of the Property to another, Wachtel, was given a $25-per-square-foot allowance. (Ex. 5 at 12.)

With those figures in mind, Mr. Shumway testified that the Debtor's projected tenant improvement expenses, which are based on $10- and $20-per square-foot assumptions made by the Debtor, are far too low if the Debtor has any hope of retaining existing tenants and enticing new tenants to rent units in the Property. The Court concurs. Indeed, given that construction costs locally and nationwide have increased substantially in recent years, and given the difficult market for office properties in the Denver metro area, the Court cannot credit the Debtor's contention that tenant improvement costs have not increased since 2022 and will remain that low through the first five years of the Third Amended Plan. As such, the Court credits Mr. Shumway's

testimony and determines that the Debtor will need to increase its budget for tenant improvement costs to at least $25 per square foot for tenant renewals and $60 per square foot for new tenants. Since the aggregate for tenant improvements in the Projections is $1,373,000 based on $10- and $20-per square-foot assumptions, the Projections are off by somewhere between $1,373,000 and $2,746.000 for tenant improvements through 2030.

#### d. **<u>The Debtor's Net Income Projections Are Inflated</u>.**

Based on its revenue and expense projections, in the Projections, the Debtor projected that its net income for the first five years of the Third Amended Plan would be as follows: -$582,051 in 2026; $270,457 in 2027; $-1,867,019 in 2028; $320,141 in 2029; and $686,085 in 2030. Adding the figures together, the Debtor projects to *lose* at least $1,391,405 in operating the Property from now until 2030. By eliminating the speculative Veridyn rent ($825,628) and increasing the projected tenant improvements by between $1,373,000 and $2,746,000, the real losses will be much greater. And, the Debtor provided no projections after 2030 even though the Debtor proposes to pay the Lender over at least 15 years. In sum, the only information provided by the Debtor in the Projections shows massive losses and no profitability ever.

### E. **<u>New Value Contributions to the Plan</u>.**

Per the Third Amended Plan: "HoldCo, an entity managed by Kenneth Grant," is supposed to make up for the substantial losses by contributing "one $500,000 up front payment to fund operational expenses, shortfalls, the Working Capital Reserve, and payments under the Plan, as well as the remaining shortfall over the term of the Plan in the amount of $1,900,000." (Docket No. 148.) But the terms of the Third Amended Plan are impossible because, as Mr. Grant now admits, HoldCo does not exist. Furthermore, neither Mr. Grant nor any related entity have secured a letter of credit or bank guarantee as required by the Third Amended Plan.

Mr. Grant has ownership interests in a number of Norwegian companies, including Toma Invest AS. Contrary to the Third Amended Plan (which Mr. Grant signed) and the Debtor's "List of Equity Security Holders," Mr. Grant now contends that Toma Invest AS is the sole equity owner of the Debtor. Frankly, the Court finds the repeated contradictions between the Third Amended Plan and Mr. Grant's testimony so pervasive that the Court finds Mr. Grant and the Debtor not to be credible. In any event, Mr. Grant claims that Toma Invest AS, a Norwegian entity, will contribute $500,000 in 2026 and up to $1,900,000 later. The Court finds the proposition entirely speculative.

Per Mr. Grant, he, his three sons, and his wife own Toma Invest AS and manage it together. But Mr. Grant is the chairman of Toma Invest AS and currently makes all of the decisions. Mr. Grant testified that he would stay in control of Toma Invest AS as long as he is alive, but there is an intent to shift control to his sons.[2] Mr. Grant agreed

---

[2] No evidence was presented that allows the Court to pinpoint Mr. Grant's age. However, Mr. Grant testified that he was educated in Colorado, worked as a real estate leasing broker in Colorado in

that his sons could have different priorities for the funds held by Toma Invest AS than he does, but asserted that he and his sons have already discussed making the $1,900,000 contribution to the Debtor in 2028. He believes his sons will make the contribution if they control Toma Invest AS at that time.

To demonstrate Toma Invest AS's financial wherewithal, the Debtor submitted Exhibit 4, an account statement for an account at DNB Carnegie dated July 17, 2026. The statement shows that Toma Invest AS has available funds in the amount of Kr 24,984,896 (Norwegian Kroner) and a net asset value of Kr 50,167,188 (approximately USD $2,600,000). According to Mr. Grant, the funds in the account are unencumbered. Mr. Grant acknowledged that he could have transferred the funds held by Toma Invest AS into a United States account and obtained a letter of credit committing to payment of the funds into the Third Amended Plan on that basis. But Mr. Grant testified that he did not do so because getting a letter of credit is very complicated and because Toma Invest AS's contribution is contingent upon the Court's approval of the Third Amended Plan. The Court does not credit the testimony. In reality, Toma Invest AS has made no binding commitment to the Debtor whatsoever and has not even agreed to be bound by the Third Amended Plan. And, the Court did not receive any testimony concerning the liabilities of Toma Invest AS.

The Court doubts Mr. Grant's financial wherewithal. In addition to being a guarantor of the full-recourse loan made to the Debtor, Mr. Grant is guarantor of other loans that are in default. Indeed, he is presently the defendant in two other lawsuits, including one related to another Colorado office building, 700 E. 17th Street, Denver, Colorado. Though such lawsuits are pending and have not been decided, Mr. Grant faces potential liability in excess of $38,000,000.

**F. <u>The Balloon Payment</u>.**

The Third Amended Plan depends completely on a proposed $8,597,619 balloon payment to be made to the Lender in 15 years: 2041. The Debtor provided no evidence regarding the ability of the Debtor to fund a $8,597,619 payment in 2041 except for Mr. Grant's surmise that the commercial real estate market may improve and the Property may be worth more by that time. Mr. Grant's statement is pure speculation. And, there are no projections that show that the Debtor will do anything other than lose money. The Court finds that the Debtor failed to demonstrate that Mr. Grant or any of his entities would be able to provide the funding the Debtor needs to stay afloat through 2030, let alone a $8,597,619 balloon payment in 2041.

---

1976 for two years before moving to New York, where he did some development, and then moved to Norway, where he presently resides and works commercial real estate. Assuming that Mr. Grant graduated from college in 1976, prior to beginning work as a real estate leasing broker, and that he graduated at age 22, the Court estimates his age to be at least 72 years old.

## V. **Legal Analysis**.

### A. **Statutory Framework for Chapter 11 Confirmation**.

The Court starts its legal analysis with the statutory framework. "To be confirmable, a plan must comply with all applicable provisions of 11 U.S.C. § 1129." *Search Mkt. Direct, Inc. v. Jubber (In re Paige),* 685 F.3d 1160, 1177 (10th Cir. 2012); *see also In re Experient Corp.,* 535 B.R. 386, 400 (Bankr. D. Colo. 2015) (same).

Section 1129(a)(1)-(16) allows for confirmation where each class has either accepted the plan or is not impaired. *Dill Oil Co., LLC v. Stephens (In re Stephens),* 704 F.3d 1279, 1284 (10th Cir. 2013) (holding that Section 1129(a) "allows for confirmation where each class of creditors consents"). Alternatively, Section 1129(b) provides a so-called "cramdown" mechanism that permits confirmation without the acceptance of each class, provided that additional requirements are satisfied, including that the reorganization plan "does not discriminate unfairly, and is fair and equitable" with respect to non-accepting impaired classes. 11 U.S.C. § 1129(b)(1); *see also Stephens,* 704 F.3d at 1284 (discussing "fair and equitable" requirement). Section 1129(b) also contains the "absolute priority rule." *Id.*

The plan proponent "must demonstrate compliance [with Section 1129] by a preponderance of the evidence." *Paige,* 685 F.3d at 1177. *See also FB Acquisition Prop. I, LLC v. Gentry (In re Gentry),* 807 F.3d 1222, 1226 (10th Cir. 2015) (confirming that burden of proof is on plan proponent);; *In re Lost Cajun Enterprises, LLC*, 634 B.R. 1063, 1072 (Bankr. D. Colo. 2021); *In re 700 17th St., LLC*, 2026 WL 1575239, at *3 (Bankr. D. Colo. Jun. 2, 2026). And, the Bankruptcy Court has an independent duty to ensure compliance with all confirmation standards. *Cf. United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 278 (2010) (holding that Bankruptcy Court must independently ensure that Chapter 13 plan complies with Bankruptcy Code); *Kaiser Aerospace & Elecs. Corp v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1299 n.4 (11th Cir. 2001) ("A court must independently satisfy itself that these criteria [11 U.S.C. § 1129] are met. Thus, it must consider facts relating to these criteria even in the absence of an objection."); *Williams v. Hibernia Nat'l Bank (In re Williams)*, 850 F.2d 250, 253 (5th Cir. 1988) (same); *In re Autterson*, 547 B.R. 372, 389 (Bankr. D. Colo. 2016) (same).

### B. **Statutory Framework for Relief from the Automatic Stay**.

After determining whether Debtor's Third Amended Plan meets the requirements of Section 1129, "and especially if the Court cannot confirm the [Third] Amended Plan," the Court must consider whether to grant relief from the automatic stay pursuant to 11 U.S.C. § 362(d). *In re 700 17th St., LLC,* 2026 WL 1575239, at *4 (Bankr. D. Colo. May 27, 2026). Under Section 362(d):

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> . . .
>
> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later —
>
> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments that —
>
> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>
> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate. . . .

**C. <u>The Plan Objection</u>.**

The Lender objects to confirmation of the Third Amended Plan on multiple grounds. In particular, the Lender contends that the Plan does not satisfy the “cram down” requirements of Section 1129(b) in that the Plan does not properly address the 1111(b) Election and violates the absolute priority rule. The Lender also contends that the Third Amended Plan is not fair and equitable as required by Section 1129(b)(2)(B)(ii); is not feasible under Section 1129(a)(11); fails to comply with the

applicable provisions of the Bankruptcy Code (namely, Section 1123(a)(1)) as required by Section 1129(a)(1); and was not proposed in good faith as required by 11 U.S.C. § 1129(a)(3).

**D. <u>The Plan Cannot Be Confirmed Because It Is Not Feasible</u>.**

Under Section 1129(a)(11), the Court shall confirm a Chapter 11 plan only if:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

The purpose of the feasibility requirement:

> "is to prevent confirmation of visionary schemes which [promise] creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation" . . . "In determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.

*Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.),* 779 F.2d 1456, 1460 (10th Cir. 1985) (quoting *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) and *Prudential Ins. Co. of America v. Monnier (In re Monnier)*, 755 F.2d 1336, 1341 (8th Cir. 1985)). *See also 700 17th St.,* 2026 WL 1575239, at * 3 and *In re Saratoga & N. Creek Rwy., LLC*, 635 B.R. 581, 607-08 (Bankr. D. Colo. 2022) (same).

"[B]ankruptcy debtors 'are not required to guarantee success of the plan.'" *Saratoga*, 635 B.R. at 608 (quoting *Ames v. Sundance State Bank (In re Ames)*, 973 F.2d 849, 851 (10th Cir. 1992)). However, to be deemed feasible, a plan must "offer[a] a reasonable assurance of success" *Id.* (quoting *Gentry*, 807 F.3d at 1225). And to show feasibility of a plan spanning a lengthy term,

> "a debtor must not only convince the court that it can make the necessary changes to fulfill its obligations under the plan, but it also faces the difficult burden of showing that macroeconomic factors or other economic changes outside of the debtor's control are not likely" to affect the repayment of creditors.

*700 17 St.*, 2026 WL 1575239, at *4 (quoting *In re Avondale Gateway Ctr. Entitlement, L.L.C.,* 2011 WL 6936526 at *10 (Bankr. D. Ariz. Dec. 27, 2011)).

The Third Amended Plan rests on an incredibly shaky foundation. To begin with, the Debtor's projected tenant improvement expenses are less than half of what they should be. But, if the Debtor's $1,373,830 tenant costs were doubled or tripled to reflect the amount they would need to be to retain existing tenants and attract new ones, such increase would wipe out the entirety of the adjusted cash reserve in the Projections, leaving the Debtor with more than $1,373,830 in additional losses stacked on the significant losses already projected. Under such circumstances, the Debtor would necessarily have to undertake further financial reorganization to survive even at the mid-Plan stage. Critically, the Projections allegedly supporting the Third Amended Plan also rest on the highly speculative assumption that the Debtor will enter into a long-term lease with Veridyn generating $825,628 of rents in the next five years. There is no evidentiary support for such rentals. Without such income, the Debtor will suffer even greater losses.

The Third Amended Plan also assumes that two critical events will occur: (1) HoldCo will contribute an aggregate of $2,400,000 to the Debtor by 2028; and (2) the Debtor (or some other person or entity) will be able to make a balloon payment of $8,597,619 in 2041. But the Debtor has failed to demonstrate that such events are likely to occur.

HoldCo does not exist. So, it stands to reason that the entity cannot contribute $2,400,000 to the Debtor by 2028. The Third Amended Plan is simply based on a false premise. Also despite pledging that Mr. Grant would obtain a letter of credit (or bank guarantee) for such funds, Mr. Grant has not done so.

The Debtor and Mr. Grant have pivoted to Toma Invest AS and suggested that that entity may make the required $2,400,000 in contributions to the Debtor (even though that is not what the Third Amended Plan provides). The Debtor's only evidence that Toma Invest AS has some financial wherewithal is a bank account statement from July 16, 2026. But Toma Invest AS hasn't formally committed to do anything. The Court does not know Toma Invest AS's liabilities. So, the idea is just speculation.

Since the Debtor has not properly accounted for costs of tenant improvements, has inflated its revenue with a speculative lease with Veridyn, and has not shown that it is likely to have the funds needed to meet the Debtor's obligations during the Third Amended Plan or to make the balloon payment at the end of the Third Amended Plan, the Court cannot find that the Third Amended Plan offers a reasonable prospect of success and is workable" such that the requirement of Section 1129(a)(11) is met. *Pikes Peak Water*, 779 F.2d at 1460 (quoting *United Props., Inc. v. Emporium Dep't. Stores, Inc.*, 379 F.2d 55, 64 (8th Cir. 1967)); *see also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 493 (S.D. Ohio 2011) ("Another failure of proof . . . relates to the balloon payment that the [Plan] requires it to make 30 years after confirmation . . . .); *F.H. Partners, L.P. v. Investment Co. of S.W., Inc. (In re Investment Co. of S.W., Inc.*), 341 B.R. 298 (10th Cir. B.A.P. 2006) ("[A] debtor must . . . sustain its burden to somehow prove that it will be able to perform all obligations it is assuming under the

plan. This is especially true when significant balloon payments are required in years not covered by the projections.").

Because the Third Amended Plan fails on feasibility grounds, the Court cannot confirm the Plan. The Court need not evaluate whether the Debtor meets the other requirements of Section 1129.

### E. <u>The Lender is Entitled to Relief from the Automatic Stay Because the Debtor Did Not Propose a Confirmable Plan within 90 Days After Entry of the Order for Relief</u>.

As the party opposing relief from stay, the Debtor bears the burden of proving a reasonable possibility of confirming a plan within a reasonable time. *700 17th St.*, 2026 WL 1575239, at * 4 (citing *In re Aspen Club & Spa, LLC*, 2020 WL 4251761, at *6 (10th Cir. BAP Jul. 24, 2020)).

The date of the filing of the voluntary petition is the date of the order for relief. 11 U.S.C. § 301(b) ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter."). The Debtor filed the Original Plan on the 90th day after the Petition Date. Like the Third Amended Plan, the Original Plan's feasibility was predicated on the Debtor's infusion of new value, paid in two-parts, during the term of the Original Plan. The language of the Original Plan was quite similar to that of the Third Amended Plan. In the Original Plan, the Debtor defined "New Value Payment" to mean:

> [T]he amount of $2,016,146.00, split as follows — one $500,000.00 up front payment to fund payments to Classes 2 and 3 on the Effective Date of the Plan, and the remaining shortfall over the term of the Plan in the amount of $1,516,146.00.

(Docket No. 79 at 5 ¶ 1.30.) In the Third Amended Plan, the Debtor similarly defined "New Value Payment" to mean:

> [T]he amount of $2,400,000.00, split as follows—one $500,000.00 up front payment to fund operational expenses, shortfalls, the Working Capital Reserve, and payments under the Plan, as well as the remaining shortfall over the term of the Plan in the amount of $1,900,000.00.

(Docket No. 148 at 4 ¶ 1.33.) Both the Original Plan and the Third Amended Plan provided that the New Value would "be paid to the Debtor by Orchard Falls Holding Company, LLC ("HoldCo"), an entity managed by Kenneth Grant, who is also an insider of the Debtor, as part of the Plan." (Docket No. 79 at 5 ¶ 1.30 and Docket No. 148 at 4 ¶ 1.33.) And both plans provided: "Mr. Grant has committed to obtaining a letter of

credit reflecting his ability to obtain this amount to have HoldCo pay towards the Plan . . . ." (Docket No. 79 at 11 and Docket No. 148 at 11.)

Per Mr. Grant's testimony, HoldCo no longer exists. Further, as the Court has found, Mr. Grant's ability to obtain funding from any other source (namely, Toma Invest AS) is (and was) uncertain since, despite representing that he would do so, Mr. Grant did not obtain a letter of credit or guarantee from any source reflecting his ability to obtain any amount that could be paid into the Original or Third Amended Plan. Under the circumstances, the Court finds that the Debtor failed to demonstrate that the Original Plan had a reasonable possibility of being confirmed within a reasonable time when it was filed on December 18, 2025 (the 90th day after the order for relief). And, the Court has found that the Third Amended Plan, filed months later, is not confirmable either. Because the Debtor has not shown that it has met the requirement of Section 362(d)(3)(A), the Court must grant relief from stay.

## VI. **Conclusion and Order**.

The Third Amended Plan does not satisfy Section 1129(a)(11), and thus cannot be confirmed. Because the Court cannot confirm the Third Amended Plan on that basis, it need not address the Lender's remaining objections. And because the Debtor has not demonstrated that it filed a plan with a reasonable possibility of being confirmed within a reasonable time as required by Section 362(d)(3)(A), the Court must grant relief from stay pursuant to Section 362(d). The Court, therefore

ORDERS that confirmation of the Third Amended Plan is DENIED for failure to meet the requirements of 11 U.S.C. § 1129(a); and

FURTHER ORDERS that the Lender is granted relief from stay pursuant to 11 U.S.C. § 362(d) to foreclose upon or otherwise exercise its available remedies under state law with respect to the Property.

DATED: October 26, 2026.

BY THE COURT:

Thomas B. McNamara

Honorable Thomas B. McNamara,
United States Bankruptcy Judge